IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| D.R. b/n/f NICCOLE LEWIS AND<br>NICCOLE LEWIS, *individually*<br>    Plaintiffs,<br><br>v.<br><br>DEVEREUX ADVANCED<br>BEHAVIORAL HEALTH<br>    Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. _____ |

## FIRST ORIGINAL COMPLAINT

D.R., by and through his next friend and mother, Niccole Lewis, and Niccole Lewis (hereinafter "Lewis"), *individually,* (collectively "Plaintiffs") file this *First Original Complaint* alleging that Devereux Advanced Behavioral Health (hereinafter referred to as "Devereux" or "Defendant"), violated the various rights of D.R., as more specifically pled herein. Plaintiffs reserve the right to replead if new claims and issues arise upon further development of the facts, as permitted by law. In support thereof, Plaintiffs would respectfully show this tribunal the following:

## I. BRIEF INTRODUCTION TO THE CASE

1. D.R. is now 17 years old. This fall he will be entering the tenth grade.

2. D.R. has special needs and has been diagnosed with pervasive developmental delays, autism spectrum disorder, bipolar disorder, depression, anxiety, and attention deficit hyperactivity disorder.

3. D.R. began attending Devereux on or about March 2, 2017.

4. During D.R.'s time at Devereux, D.R. was repeatedly subjected to verbal and physical abuse and assaults at the hands of Devereux employees.

5. As a result of the abuse, assaults, and actions and inactions of Devereux, D.R. suffered physical injuries and continues to suffer from anxiety, depression, and an increase in negative behaviors.

6. Parents of children with special needs rely heavily on the professionalism and competence of the persons who are entrusted with the care of their children. This is especially true when the child is speech impaired, like D.R. The fact that some of these persons misuse their position is disheartening and frightening and is fast becoming a national epidemic. However, unlike the task of containing the spread of a flu virus by means of vaccines and treatment, this type of epidemic is particularly difficult to treat because the institution employing the persons at fault is part of the illness and refuses to recognize its own responsibility, as in this case. Specifically, Devereux hired persons without the necessary experience, training, and supervision to provide care for D.R., which resulted in the incidents upon which this lawsuit is based.

7. For families, there is nothing sadder than witnessing their children suffer. To give meaning to their child's experience, they feel compelled to tell their story. They feel a duty to do so in the hope the presentation of their story will prevent the same from happening to another family. In the course of this telling, these victims benefit from a healing effect. The healing and empowering effect is even more pronounced when the story is told before a neutral tribunal, as Plaintiffs chose to do in his case, so that the bright light and sanitizing effect of federal law is focused on this important issue and Devereux's failures.

## II. JURISDICTION

8. Jurisdiction is conferred upon this Court pursuant to 28 U.S.C.A. §1331 and 1343 because the matters in controversy arise under the laws of the United States.

9. Furthermore, this Court has supplemental jurisdiction over various state and common law claims pursuant to 28 U.S.C. §1367.

## III. VENUE

10. Under 28 U.S.C. §1391, venue is proper before this Court because the events and omissions giving rise to Plaintiffs' claims occurred in the Southern District of Texas, Galveston Division.

## IV. PARTIES

11. D.R. lives with his mother, Niccole Lewis, and brother at 4318 Deenann Court, Abilene, Texas 79606.

12. Niccole Lewis lives at 4318 Deenann Court, Abilene, Texas 79606.

13. Devereux Advanced Behavioral Health in League City, Texas is a domestic nonprofit corporation organized under the laws of the State of Texas. They may be served by and through their registered agent for service, 1150 Devereux Drive, League City, TX 77573

## V. STATEMENT OF FACTS

14. D.R. was born on April 23, 2001. He is currently 17 years old.

15. D.R. suffers from multiple disabilities, including pervasive developmental delays, autism spectrum disorder, bipolar disorder, depression, anxiety, and attention deficit hyperactivity disorder.

16. During the relevant time period made the basis of this complaint, he was a resident of

Devereux, a behavioral center for children and adolescents, in League City, Texas.

17. In order to help him cope with his disabilities and to prepare him to successfully attend school, D.R.'s mother, Niccole Lewis, registered him to attend Devereux Advanced Behavioral Health.

18. Devereux told Lewis that they would help D.R. cope with his disabilities, teach him social skills, and educate him, and that D.R. would learn to appropriately interact with other people.

19. Devereux also told Lewis that if D.R. worked their program as specified, he would be able to tolerate a full school day.

20. D.R. arrived at Devereux on March 22, 2017 and within weeks Lewis received reports from Devereux of D.R. becoming more independent. Lewis was told that D.R. was learning how to do his own laundry and socialize with his peers, among other things.

21. Unfortunately, these positive experiences were coupled with horribly negative experiences.

22. On or about May 20, 2017 at about 1:30 PM, D.R. injured his knee playing basketball.

23. Lewis called Devereux about 2:45 PM and spoke to a nurse to check on D.R. and was told Devereux employees were monitoring him and waiting on a call from the Devereux doctor to determine whether he would be sent to the emergency room.

24. Lewis told the nurse that she believed D.R. needed to go to the ER, and the nurse told her they had to wait for the Devereux doctor to call back because the doctor had to make the determination regarding whether D.R. should go to the ER.

25. The following day, Devereux finally took D.R. to Clear Lake Emergency Medical Corps

where they learned that the injury resulted in deep bruising, and he was ordered to bed rest. Devereaux did not contact Lewis before or after taking D.R. to the ER.

26. A few days later, on or about May 29, 2017, Lewis called to check on D.R. and spoke with Nurse Tina Bauer who told claimed that D.R. was acting like he wanted someone to "beat him up" so he could go home.

27. Naturally, Lewis was alarmed at this comment considering that D.R. was reported to have been to be enjoying his time at Devereux and his newfound independence. On or about the same day, Lewis emailed and expressed her concern to Bauer, Devereux case coordinator Kristina Woods, and Devereux Unit 3 Supervisor Joseph Miller.

28. That same day, on May 29, 2017, D.R. was restrained by Direct Support Personnel (DSP) Mike Sorrels and Jessica Canceres. During the incident, Canceres climbed on top of D.R. and further injured his knee. This intervention was not in accord with his Individualized Treatment Plan ("ITP") or any behavioral management plan for D.R. Such acts and omissions evidence a failure to correctly train staff.

29. That night, D.R. told Lewis that during the restraint while Canceres was top of his knee, he was telling the DSPs that they were "breaking his leg", and that he "heard something pop" in his knee.

30. The following day, Lewis spoke with Bauer about what D.R. told her regarding the restraint and that she wanted D.R. to be sent to the ER.

31. Due to D.R. continuously complaining about pain in his knee, Devereux finally took D.R. to the ER where they took an x-ray and determined that D.R. might have a torn ACL (anterior cruciate ligament) or bone fracture, and he was referred to a specialist.

32. On June 12, 2017, D.R. received an MRI of his knee.

33. On or about June 14, 2017, D.R. went to see orthopedic surgeon, Dr. Kelly Carmichael, who determined that suffered a torn ACL from the restraint and required knee surgery.

34. On or about June 22, 2017, D.R. had knee surgery and 2 screws were put into his injured knee to hold it in place. After the surgery, D.R. had to use a wheelchair for eight weeks to avoid putting weight on his knee.

35. On or about July 24, 2017, D.R. was in his room with his roommate "J.B.". DSP Feliz Johnson walked by the room and D.R. asked Johnson whether a package arrived for him, and D.R. was unhappy that Johnson would not tell him whether the package he was expecting had arrived.

36. Johnson told D.R. to be quiet and entered the room and closed the door, which was against Devereux's policies.

37. Johnson then became aggressive and told D.R. that he was "sick and tired of his shit" and that "[D.R.] thought he was so special" and called him a "bitch" and a "punk" and similar derogatory things and names.

38. Then, Johnson approached D.R., grabbed him by his shirt, pulled him out of his wheelchair, threw him on the bed face-down, climbed on top of D.R. with one leg on each side of his body, and put his arm around D.R.'s neck in a choke-hold. This intervention also was not in accord with his Individualized Treatment Plan ("ITP") or any behavioral management plan for D.R.  Such acts and omissions evidence a failure of Senior staff to correctly supervise and train ward staff.

39. J.B. witnessed Johnson assaulting D.R. and went to get DSP Patrick Johnson ("Mr. Pat")

*First Original Complaint*

6

for help.

40. As D.R. felt like he was about to pass about, Mr. Pat entered the room and physically removed Johnson from D.R.

41. Devereux never contacted Lewis about the incident.

42. Thereafter, on July 27, 2017 just before a scheduled video-conference family session, Devereux therapist Keshil Waterland called Lewis and stated that D.R. had some things he wanted to tell her at the family session that day that would alarm her.

43. Waterland then put D.R. on the video-conference, and D.R. told Lewis about the July 24, 2017 assault by Johnson.

44. That day, Lewis called Woods (case coordinator) who stated that she would investigate the incident. Lewis stated that she did not want Johnson to have contact with D.R., and Woods told Lewis that Johnson would be transferred pending the investigation.

45. On July 28, 2017, Lewis emailed Devereux supervisor Joseph Miller who thereafter called her that night and assured her that they were investigating the incident and they would keep D.R. safe.

46. Lewis stated to Miller that there should be an incident report, and Miller stated that no one prepared an incident report and there was no documentation of the incident.

47. Waterland did not report the alleged assault to anyone at Devereux.

48. Despite requests, Devereux never provided Lewis an investigation report of the assault.

49. On or about August 8, 2017, D.R. defecated on himself, which often happens when he gets anxious.

50. Because his clothes were soiled, he requested a change of clothes from Unit 3 Nurse Elise

Cooper.

51. However, Cooper refused to give him a change of clothes.

52. In response to such refusal, D.R. became verbally aggressive, which resulted in him being restrained by Unit 3 Supervisor Joseph Miller, DSP Christopher Reeves, and DSP Mike Sorrels. This intervention also was not in accord with his Individualized Treatment Plan ("ITP") or any behavioral management plan for D.R. Such acts and omissions evidence a failure of Senior staff to correctly supervise and train ward staff.

53. During the restraint, D.R.'s knee was reinjured and he was taken to the ER. D.R. was again placed on best rest and told to be non-weight bearing for the next 2 weeks.

54. Towards the end of August 2017, Hurricane Harvey hit the Houston area, and all clients were evacuated and taken to Latham Springs Camp and Retreat Center in Aquila, Texas.

55. A few days after their arrival in Aquila, Texas, Lewis went to visit D.R., and she immediately saw that the area was not secure. This is concerning because D.R. was known to elope. In addition, the conditions were cramped, which Lewis knew would be a problem for D.R. due to his sensory issues and documented need for space.

56. During that visit, Miller approached Lewis and asked if she was there to take D.R. home, and he stated that Devereux could not adequately meet D.R.'s needs at that site. In addition, Miller stated that the campsite was not locked and was understaffed. Miller encouraged Lewis to take D.R. home.

57. Due to the traumatic experiences D.R. had already endured at Devereux, Lewis felt D.R. needed a therapeutic pass for a day, which Lewis requested.

58. Thereafter, Devereux gave Lewis a letter which stated that D.R. was no longer permitted

at Devereux until they relocated back to their regular facility.

59. Thereafter, D.R. remained at home for a month without receiving any services from Devereux, some of which could have been administered via telephone or video-conference, including his therapy/counseling sessions and educational instruction.

60. When D.R. returned to Devereux in League City, Texas on October 4, 2017, Devereux staff continued their mistreatment of him.

61. In December 2017, during an in-person family session including D.R., Lewis, and Devereux therapist Laura Robinson, D.R. reported that multiple Devereux employees were verbally abusive and regularly cursed at the clients.

62. On or about January 10, 2018, due to the fact that Devereux never provided her an incident report or investigation, Lewis emailed Devereux case coordinator Tracy Bernard and asked specific questions regarding the July 24, 2017 assault and investigations.

63. On or about January 11, 2018, Joseph Miller responded to Lewis' email to Bernard regarding the July 24, 2017 assault and investigations but did not provide answers to all her questions; he advised that D.R.'s allegations regarding the assault were unfounded.

64. On or about January 29, 2018, at a telephonic family session including D.R., Lewis, and therapist Laura Robinson, D.R. shared that DSP Jahmile Thomas was verbally abusive, even to the point of threatening to fight D.R.

65. D.R. stated that Thomas' verbal aggression and abuse toward D.R. were increasing.

66. In addition, D.R. stated that Thomas had even called D.R. a "blue nigger", which is a derogatory slur regarding the darkness of his skin.

67. D.R. stated that he was afraid of Thomas because he knew Thomas also worked in an

adult correctional facility.

68. D.R. also shared that some of his peers at Devereux complained to him about Thomas' verbal and physical aggression and told D.R. that when Thomas worked the nighttime shift, he would come into their rooms and physically assault them by hitting them and throwing them on the floor from their beds. Upon information and belief, these interventions were not in accord with *any* clients' Individualized Treatment Plans ("ITP") or behavioral management plans. Such acts and omissions evidence a failure of Senior staff to correctly supervise and train ward staff.

69. Thereafter, on January 30, 2018 during a telephonic meeting with D.R.'s treatment team, Lewis reported Thomas' behavior, including Thomas' threats to D.R., the derogatory slur Thomas called D.R., and that D.R. was afraid of Thomas. D.R.'s Treatment Team consisted of Abilene ISD special education director Connie Mangin, Devereux physician Dr. Tulan Nguyen, Devereux nurse Elise Cooper, D.R.'s teacher(s), Devereux case coordinator Brad Fahnert, and Devereux therapist Laura Robinson.

70. In response to Lewis' report, Dr. Tulan Nguyen told Lewis, "If you don't like the program, you can take him out".

71. Upon information and belief, Devereux never investigated the report made by Lewis on January 30, 2018.

72. One day later on January 31, 2018, Thomas assaulted and abused D.R. This intervention also was not in accord with his Individualized Treatment Plan ("ITP") or any behavioral management plan for D.R. Such acts and omissions evidence a failure of Senior staff to correctly supervise and train ward staff.

73. Specifically, Thomas struck D.R. which started a fight between the two, a Devereux staff member and a client with disabilities.

74. D.R. suffered an abrasion to his to his head, a contusion on his face, and a large abrasion across his shoulder area.

75. D.R. still has scars on his head and his left shoulder from the injuries he sustained that day.

76. On or about February 1, 2018, Devereux supervisor Shalisa Caesar called Lewis and stated that she was reporting the incident to CPS.

77. Upon information and belief, Devereux did not perform an investigation into the assault on February 31, 2018.

78. The Texas Department of Family Protective Services began an investigation into the incident, and investigator Lynette Damra headed up the investigation.

79. Damra interviewed D.R. and verified D.R.'s story with a Devereux nurse.

80. Damra called Lewis and advised that her recommendation was that Thomas never be allowed to work around children again.

81. Shortly thereafter, Devereux supervisor Rodney Brown and Brad Fahnert both assured Lewis that Thomas was "taken off the schedule."

82. As she advocated for her son, Lewis learned that some of Devereux's employees also worked in correctional facilities. Clearly, this presents a problem because some people—like Johnson and Thomas—are not able to appropriately differentiate between being responsible for inmates and caring for children with disabilities while being employed in both roles simultaneously. Upon information and belief, both Johnson and Thomas were

employed at correctional facilities at the same time they were employed at Devereux.

83. On or about April 10, 2018, Lewis attended a teleconference with Brad Fahnert, Rodney Brown, Shalisa Caesar, Devereux supervisor Marvin Bouldin, and Devereux Unit Supervisor Jeremy Austin. During this conference, she found out that Thomas had returned to work at the League City Devereux campus because his "safety plan" at Devereux was amended.

84. Apparently, as a result of the January 31, 2018 assault, Devereaux put into place a "safety plan" specifically for Thomas, but never informed Lewis of the plan or produced it to her.

85. In addition, Devereux failed to inform Lewis that Thomas returned to work at Devereaux after the January 31, 2018 assault and would therefore have contact with D.R.

86. On or about April 9, 2018, D.R. had a panic attack when he saw Thomas at Devereux.

87. Additionally, that day, a Devereux staff member reported to Lewis that D.R. was acting "weirder" than normal, obviously as a result of the abuse and assaults experienced by D.R. and then seeing Thomas back at Devereux. Specifically, D.R. was slobbering and speaking nonsensically.

88. Upon information and belief, the trauma experienced by D.R. in seeing Thomas on April 9, 2018 in connection with the previous abuse and assaults inflicted by Thomas on D.R. caused D.R. to experience a break in realty.

89. The original plan and goal was for D.R. to stay at Devereux until August 2018 in order to be prepared to attend school in the fall, but due to the abuse, assaults, and other actions and inactions of Devereux, Lewis decided it was best for him to be discharged earlier.

90. Due to fear for her son's safety, on April 14, 2018, Lewis flew to Devereux to retrieve

D.R., and he was discharged from Devereux that day.

91. Due to the abuse, assaults, and the acts and omissions of Devereux, D.R. suffered and continues to suffer from a lack of trust in adults, increased anxiety, depression, an increase in negative behaviors, and physical scars.

## VI. CLAIMS RELATED TO THE REHABILITATION ACT OF 1973

92. Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

93. Upon information and belief Devereux receives federal funds either directly or indirectly and thus follows the requisites of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794.

94. The implemented regulations of Section 504 require that each state that receives disbursements, including the state's political subdivisions such as residential treatment centers for children, must ensure all children with disabilities are given appropriate and necessary accommodations, pursuant to federal law and rules. To the degree that a policy or practice hinders honest consideration of D.R.'s disabling conditions and needs and fails to accommodate his disabilities and keep him safe, it violates Section 504.

95. Plaintiffs further assert that because Devereux failed to provide D.R. a safe and non-hostile environment, such failures as noted above have together and separately contributed to violating his rights pursuant to Section 504 and the federal rules and regulations promulgated pursuant thereto.

96. In a similar vein, and likewise in addition and in the alternative, the failures denoted herein by Devereux were a gross deviation from professional standards of care.

97. Further, D.R. has a private cause of action for violation of the regulations promulgated under Section 504 due to the acts and omissions by Devereux.

98. In addition, due to the acts and omissions of Devereux, D.R. was a victim of disparate impact as prohibited by section 504.

99. The acts and omissions of Devereux specifically undermined and interfered with D.R.'s right to privacy and bodily integrity for which Devereux is liable to him pursuant to Section 504.

100. The acts and omissions of Devereux rise to the level of discrimination based upon disability, thereby.

## VII. NEGLIGENCE

101. Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

**A.     General Negligence**

102. Defendant owed a legal duty to D.R.

103. Defendant breached that duty.

104. The breach proximately caused injury to D.R.

**B.     Negligent Hiring, Training, Supervision**

105. Defendant owed D.R. a duty to hire, train, and supervise competent employees.

106.  Defendant breached that duty.

107. The breach caused injury to D.R.

**C.     Gross Negligence**

108. Plaintiffs would show that the acts and/or omissions of Defendant complained of above

constituted gross negligence.

109. These acts and/or omissions were representative of conscious indifference to the welfare of D.R., and as such, he seeks recovery of exemplary damages against Defendant, by way of example and of punishment in order to discourage future misconduct by those similarly situated to Defendant.

### VIII. INTENTIONAL INFLICTION OF SEVERE MENTAL AND EMOTIONAL DISTRESS

110. Plaintiffs incorporate by reference all of the above related paragraphs, as well as those below, with the same force and effect as if fully set forth herein.

111. Plaintiffs allege that D.R. was a victim of Intentional Infliction of Severe Mental and Emotional Distress, due to the acts and omissions by Defendant.

112. Plaintiff D.R. is a person.

113. The Defendant acted intentionally and recklessly.

114. The Defendant's conduct was extreme and outrageous.

115. The Defendant's conduct proximately caused D.R. emotional distress.

### IX. ASSAULT AND BATTERY

116. Plaintiffs incorporate by reference all of the above related paragraphs, as well as those below, with the same force and effect as if fully set forth herein.

117. Plaintiffs allege that D.R. was a victim of assault and battery due to the acts and omissions by Defendant.

118. Defendant acted intentionally, knowingly, and recklessly.

119. Defendant made physical contact with D.R.'s body.

120. Defendant's conduct proximately caused D.R. physical injuries.

## X. RESPONDEAT SUPERIOR

121. Plaintiffs incorporate by reference all the above related paragraphs with the same force and effect as if herein set forth.

122. Devereux ratified the acts and omissions of its employees, staff, and representatives.

123. At all times when the employees of Devereux committed the bad acts set forth and described herein, such employees were acting as representatives of Devereux.

124. Devereux is responsible for the acts and omissions of its employees, staff, and representatives pursuant to the theory of *Respondent Superior.*

## XI. PROXIMATE CAUSE

125. Plaintiffs incorporate by reference all allegations in the above related paragraphs with the same force and effect as if herein set forth. Each and every, all and singular of the foregoing acts and omissions, on the part of Devereux, taken separately and/or collectively, jointly and severally, constitute a direct and proximate cause of the injuries and damages set forth herein.

## XII. RATIFICATION

126. Devereux ratified the acts, omissions and customs of all its administrators, educators, personnel, staff and agents. As a result, Devereux is responsible for the acts and omissions of all its administrators, educators, personnel, staff, and agents.

## XIII. NICCOLE LEWIS'S INDIVIDUAL CLAIMS

127. Lewis seeks damages and reimbursement for economic losses she incurred and will continue to incur as a result of the acts and omissions by Devereux as set forth herein.

128. Such economic losses include, but are not limited to, losses due to time off work and medical expenses.

## XIV. SPOLIATION

129. Plaintiffs hereby require and demand that Devereux preserve and maintain all evidence pertaining to any claim or defense related to the incidents made the basis of this complaint or the damages resulting therefrom, including statements, photographs, videotapes, audiotapes, surveillance, security tapes, business or medical records, incident reports, telephone records, emails, text messages, electronic data/information, and any other evidence regarding the assault or other violations set forth herein.

130. Failure to maintain such items will constitute "spoliation" of evidence, which will necessitate use of the spoliation interference rule—an inference or presumption that any negligent or intentional destruction of evidence was done because the evidence was unfavorable to the spoliator's case.

## XV. DAMAGES

131. Plaintiffs incorporate by reference all of the above related paragraphs, as if fully set forth herein.

132. As a direct and proximate result of Devereux's conduct, Plaintiffs suffered injuries and damages, which they may seek compensation thereby, all within the jurisdictional limits of this court, including but not limited to the following:

   a. Physical pain in the past;
   b. Physical pain in the future;
   c. Medical expenses in the past;

    d.    Medical expenses in the future;

    e.    Mental anguish in the past;

    f.    Mental anguish in the future;

    g.    Physical impairment in the past,

    h.    Physical impairment in the future;

    i.    Aggravation of a pre-existing condition

    j.    Loss of opportunity, including educational opportunity;

    k.    Loss of companionship;

    l.    Loss of future wages;

    m.    Loss of earning capacity;

    n.    Injury to reputation;

    o.    Past economic losses; and

    p.    Future economic losses.

133. By reason of the above, the subject of this lawsuit, Plaintiffs suffered losses and damages in a sum within the jurisdictional limits of the Court and for which this lawsuit is brought.

## XVI. <u>ATTORNEYS' FEES</u>

134. Plaintiffs incorporate by reference all of the above related paragraphs, as if fully set forth herein.

135. It was necessary for Plaintiffs to hire the undersigned attorneys to file this lawsuit. Upon judgment, Plaintiff is entitled to an award of attorney fees and costs pursuant to Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794.

*First Original Complaint*

## XVII.  DEMAND FOR A JURY TRIAL

136.   Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a jury trial for all issues in this matter.

## XVIII. PRAYER

137.   WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray for judgment against the Defendant in the manner and particulars noted above, and in an amount sufficient to fully compensate them for the elements of damages enumerated above, judgment for damages, recovery of attorney's fees, expert fees and other taxable and non-taxable costs for the preparation and trial of this cause of action, and for its appeal if required, pursuant to Section 504 and 42 U.S.C. § 2000d et seq.; together with pre- and post-judgment interest, and additional court costs expended herein, and for such other relief as this Court deems just and proper may deem just and proper in law or in equity or both.

Respectfully submitted,

/s/ *Marty Cirkiel*
Mr. Martin J. Cirkiel
SBN 00783829
Federal ID No. 21488
Ms. Holly Griffith Terrell, *Of Counsel*
State Bar No. 24050691
Federal ID No. 1034278
Cirkiel & Associates, P.C.
1901 E. Palm Valley Blvd.
Round Rock, Texas 78664
(512) 244-6658 [Telephone]
(512) 244-6014 [Facsimile]
marty@cirkielaw.com [Email]
holly@cirkielaw.com [Email]

Mr. Anthony O'Hanlon
**Anthony O'Hanlon, P.C.**
SBN 15235520
Federal ID No. 3122684
111 South Travis Street
Sherman, Texas 75090
(903) 892-9133 [Telephone]
(903) 957-4302 [Facsimile]
aohanlon@somlaw.net [Email]

**ATTORNEYS FOR PLAINTIFFS**